UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

**FILED**

MAY 0 8 2015


CLERK

| | |
|---|---|
| ROBERTA R. DROWN,<br><br>Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, ACTING COMM'R OF SOCIAL SECURITY,<br><br>Defendant. | 4:14-CV-04019-RAL<br><br><br>OPINION AND ORDER AFFIRMING COMMISSIONER'S DECISION |

Plaintiff Roberta R. Drown (Drown) seeks reversal of the Commissioner of Social Security's decision denying Drown's application for Social Security Disability Insurance (SSDI) benefits. For the reasons explained below, this Court affirms the Commissioner's decision denying benefits.

## I.  Procedural Background

Drown filed for supplemental security income and attendant Medicare and Medicaid benefits on March 15, 2011, alleging a disability onset date of December 14, 2010. AR[1] 160–70. Drown's claim initially was disapproved on May 11, 2011. AR 97–99. Drown then filed for disability insurance benefits on May 12, 2011, AR 160–61, and requested reconsideration of the initial denial of the benefits on June 27, 2011, AR 100–03. The regional commissioner denied disability benefits and supplemental security income to Drown on October 5, 2011. AR 107–11. Drown then requested an administrative hearing on her claims. AR 112–13.

---

[1]The Appeal Record will be cited as "AR" followed by the page or page numbers.

Drown received a hearing on October 4, 2012, before Administrative Law Judge (ALJ) Denzel R. Busick. AR 29–58. The only witnesses who testified were Drown and vocational expert Thomas Audet. AR 33–56. On December 7, 2012, ALJ Busick issued his written decision denying benefits sought by Drown. AR 12–20. The ALJ applied the five-step sequential evaluation, finding in steps one and two that Drown met the insured status requirements of the Social Security Act and that Drown had not engaged in substantial gainful activities since the alleged onset date of December 14, 2010. AR 14. The ALJ then concluded that Drown had severe impairments of rheumatoid arthritis (RA), bilateral trochanteric and anserine bursitis, and fibromyalgia. AR 14. The ALJ characterized as non-severe impairment Drown's history of hyperthyroidism, hypertension, dyspnea, menorrhagia, anemia, and laryngopharyngeal reflux and vocal cord spasm. AR 15. The ALJ then determined in step three that Drown did not have any impairment meeting or medically equaling the severity of listed impairments in Social Security regulations. AR 15–16. Next, the ALJ determined that Drown had the residual functional capacity to perform sedentary work within certain parameters, but was not able to perform her past relevant work. AR 16–19. Finally, at step five, the ALJ determined—based on a hypothetical question posed to vocational expert Audet and based on the ALJ's consideration of Drown's age, education, work experience, and RFC—that there were jobs existing in significant numbers in the national economy, such that Drown would not be considered "disabled." AR 19–20, 54–56, 240–46.

Drown requested review by the appeals council. AR 7–8. On December 13, 2013, the appeals council denied Drown's request. AR 1–3. Drown now challenges the Commissioner's denial of benefits, raising three separate issues:

> I.    Did the ALJ correctly determine whether Plaintiff's combined impairments equaled a listing-level impairment?

2

>            II.      Did the ALJ assess credibility in accordance with legal
>     criteria and substantial evidence on the record as a whole?
>            III.     Did the ALJ assess "residual functional capacity" in
>     compliance with legal criteria and based upon substantial evidence
>     on the record as a whole?

Doc. 17 at 33.

## II.    Factual Background

Drown was born in October of 1964. AR 162. She married Lonny Drown in 1984, earned a GED in 1985, and lives in Howard, South Dakota. AR 161–63, 193. The Drowns had three daughters, one of whom was living at home at the time Drown applied for disability benefits. AR 209, 256. Drown worked in various jobs until her alleged onset of disability date of December 14, 2010. AR 178–80. Since 2000, those jobs have included being an assistant daycare provider for Children's Care Corner, a custodian at Bethany Lutheran Church, a secretary for the Miner County Community Health nurse, a substitute teacher and teacher's aide for the Howard School District, an assistant care provider at an afterschool program, and various duties (assistant cook, dishwasher, waitress, and caterer) at a restaurant. AR 175–87, 200–07. Drown's most recent job, held from August of 2006 until December 14, 2010, was as a teacher's aide for the Howard School District. AR 200.

Drown had been in good health until November of 2010. On November 16, 2010, Drown went to Avera St. Joseph Clinic in Howard for an evaluation of upper respiratory symptoms, cough, congestion, and bilateral ear discomfort. AR 281. Drown recalled having these symptoms for the prior three weeks, was not getting better, and reported having been exposed to mycoplasma pneumonia earlier in the year through her daughter. AR 281. A blood test revealed

a positive result for mycoplasma IgM[2] at that time.  AR 309.  Drown received an albuterol[3] metered dose inhaler and a prescription for cough control.  AR 281.  Around the first of December, Drown called Avera St. Joseph Clinic reporting that her ears were still feeling full and that she remained somewhat short of breath, but was not having any fevers.  AR 278, 281. Drown was advised to try over-the-counter medications such as Claritin-D or Zyrtec.  AR 278.

On December 14, 2010, the date Drown chose as the onset of her claimed disability, Drown returned to Avera St. Joseph Clinic for a checkup on her condition.  AR 278.  On examination, a physician's assistant (PA) recorded that Drown appeared quite tired, had easy and unlabored respirations with adequate air exchange, had no rales or wheezing, and had normal heartrate and rhythm.  Drown's tympanic membranes seemed congested, but nasal mucosa was unremarkable as was the oropharyngeal examination.  AR 278.  A repeat test for mycoplasma pneumonia was ordered, AR 278, which again resulted in a positive outcome for mycoplasma IgM.  AR 307.  The PA changed Drown's medications to the antibiotic Levaquin[4] and wrote a note to have Drown remain off work until a follow-up visit the following Friday, December 17, 2010.  AR 278–79.

---

[2]Testing a person's blood for the presence of mycoplasma antibodies helps determine whether mycoplasma pneumoniae—bacteria-like organisms—are the cause of a respiratory tract infection.  Mycoplasma, Lab Tests Online (Oct. 10, 2013), http://labtestsonline.org/understanding/analytes/mycoplasma/tab/test/.  Mycoplasma IgM antibodies are the first antibodies produced by the body to fight a mycoplasma pneumoniae infection. Id.

[3]Albuterol is a medicine inhaled through the mouth to increase the flow of air through the bronchial tubes.  Drugs and Supplements: Albuterol (Inhalation Route), Mayo Clinic (April 1, 2015), http://www.mayoclinic.org/drugs-supplements/albuterol-inhalation-route/description/drg-20073536.

[4]Levaquin is the brand name for levofloxacin, an antibiotic used to treat bacterial infections in many parts of the body.  Drugs and Supplements: Levoflaxacin (Oral Route), Mayo Clinic (April 1, 2015), http://www.mayoclinic.org/drugs-supplements/levofloxacin-oral-route/description/drg-20074518.

When Drown returned to Avera St. Joseph Clinic on December 17, 2010, she had some shortness of breath and fatigue, "but definitely [was] not getting any worse since starting the Levaquin." AR 277. Her chest x-ray revealed no definite acute process. AR 277. Her white blood cell count was within a normal range and improving. The PA continued Drown on Levaquin and instructed her not to return to work until after the holidays "as she works at school and there are only 3 days of work next week." AR 277. Over the next two weeks, Drown called on three separate occasions, each time reporting that she was feeling better, although in her final call she reported achiness in her muscles and joints and difficulty sleeping. AR 276.

On December 30, 2010, Drown reported to Avera St. Joseph Clinic with complaints of generalized body aches, muscle aches, and joint discomfort which had intensified over the previous four days. AR 274. Drown last had taken Levaquin on December 23, 2010. AR 274. The PA ordered a blood draw, which later showed an elevated rheumatoid factor.[5] AR 298. Drown received a prescription for Cataflam.[6] AR 274. Avera St. Joseph Clinic then scheduled Drown to be seen by an Avera rheumatologist. AR 275.

On January 10, 2011, Drown returned to Avera St. Joseph Clinic on a follow-up check for rheumatoid arthritis. AR 273. Drown reported that her mornings were most difficult, particularly when the effects of the Cataflam prescription wore off. Drown stated that she felt unable to return to work at that point because of her pain level. AR 273. On examination, the PA described Drown as being "in no acute distress" and without having any red or inflamed joints at the time. AR 273. Drown's complaints of greatest tenderness were in her knees, hips,

---

[5]"Rheumatoid factors are proteins produced by [one's] immune system that can attack healthy tissue in [the] body." Tests and Procedures: Rheumatoid Factor, Mayo Clinic (July 9, 2013), http://www.mayoclinic.org/tests-procedures/rheumatoid-factor/basics/definition/prc-20013484.
[6]Cataflam is a brand name for diclofenac, a nonsteroidal anti-inflammatory drug used for pain relief. Drugs and Supplements: Diclofenac (Oral Route), Mayo Clinic (April 1, 2015), http://www.mayoclinic.org/drugs-supplements/diclofenac-oral-route/description/drg-20069748.

elbows, and shoulders. The laboratory studies showed a high rheumatoid factor at 165, but the remainder of her tests were relatively normal. AR 273. Her assessment at the time was "acute onset rheumatoid arthritis," without any other condition mentioned. AR 273. The PA added tramadol[7] and methylprednisolone[8] to her prescriptions of Cataflam and her inhaler, with the option of taking Synthroid[9] and albuterol as needed and with Drown to check back in a week or sooner if she had any difficulty. AR 273. The PA advised that "after she starts the Methylprednisolone she may feel more like returning to work sooner." AR 273.

On January 18, 2011, Drown returned to Avera St. Joseph Clinic for a follow-up check for rheumatoid arthritis. By that point, she had been on steroidal medication for two weeks. AR 271. Drown had been using tramadol with Tylenol in between the doses of Cataflam, which seemed to control her pain fairly well. Drown reported that her symptoms were about the same; she was sleeping well at night, although some nights she would awaken because of the pain. AR 271. Drown appeared to be "in no acute distress," and her physical examination was normal. AR 271. Although Drown's assessment remained solely rheumatoid arthritis, AR 271, the PA ordered a chest x-ray, the result of which was consistent with resolving mycoplasma pneumonia, AR 312.

---

[7]The PA prescribed Ultram, which is a brand name for tramadol, an opioid analgesic used to treat moderate to moderately severe pain. Drugs and Supplements: Tramadol (Oral Route), Mayo Clinic (April 1, 2015), http://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050. At various places, the medical records refer to this prescription both as "tramadol" and as "Ultram." To avoid confusion, the Court will refer to it only as "tramadol" in this Opinion.

[8]Methylprednisolone is a corticosteroid that works on the immune system to relieve swelling, redness, itching, and allergic reactions. Drugs and Supplements: Methylprednisolone (Oral Route), Mayo Clinic (April 1, 2015), http://www.mayoclinic.org/drugs-supplements/methylprednisolone-oral-route/description/drg-20075237.

[9]Synthroid is a brand name of levothyroxine, a drug used to treat hypothyroidism (an enlarged thyroid gland). Drugs and Supplements: Levothyroxine (Oral Route), Mayo Clinic (April 1, 2015), http://www.mayoclinic.org/drugs-supplements/levothyroxine-oral-route/description/drg-20072133.

6

On February 3, 2011, Drown began a course of treatment with Dr. Kara Petersen of Avera Rheumatology in Sioux Falls. Dr. Petersen recounted in her initial medical record Drown's history with mycoplasma pneumonia in November and December of 2010 and generalized joint and muscle pain beginning suddenly in December of 2010. AR 386. Drown described to Dr. Petersen difficulty performing routine activities of daily living and feeling pain and weakness. AR 386. Dr. Petersen did what appears to be a thorough workup. AR 382–86. Dr. Petersen noted the positive rheumatoid factor potentially suggestive of rheumatoid arthritis, but was reluctant to make that diagnosis because her physical examination of Drown revealed no objective findings of inflammation or synovitis[10] and was essentially normal. AR 383. Dr. Petersen noted that infections can be associated with elevated rheumatoid factors and that polyarthritis[11] can develop as a result of mycoplasmic infections. AR 383. Dr. Petersen ordered certain labs and placed Drown on prednisone[12] until seen in follow-up. AR 383.

Drown returned to see Dr. Petersen on February 11, 2011, and reported being no worse but no better. AR 378–81. Drown complained of significant dyspnea.[13] AR 380. Drown nonetheless had an essentially normal physical examination, including lung examination. The range of motion assessments of all of her peripheral joints were normal, she had a normal gait for her age and body type, and again had no objective findings of joint inflammation or synovitis.

---

[10]Synovitis is an inflammation of the synovial membrane—the membrane that secretes lubricating fluid between one's joints. Webster's Third New International Dictionary 2321 (Philip Babcock Gove ed. 1976).

[11]Polyarthritis is "arthritis involving two or more joints." Webster's Third New International Dictionary, supra note 10, at 1757.

[12]Prednisone is a corticosteroid that works on the immune system to relieve swelling, redness, itching, and allergic reactions. Drugs and Supplements: Prednisone (Oral Route), Mayo Clinic (April 1, 2015), http://www.mayoclinic.org/drugs-supplements/prednixone-oral-route/description/drg-20075269.

[13] Dyspnea is the medical term for shortness of breath. Symptoms: Shortness of Breath, Mayo Clinic (April 13, 2013), http://www.mayoclinic.org/symptoms/shortness-of-breath/basics/definition/sym-20050890.

7

AR 379–80. Her lab results included a high-titer antibody suggestive of and consistent with rheumatoid arthritis. AR 379.

Because of Drown's ongoing dyspnea and cough, Dr. Petersen arranged for Drown to see Dr. Fady Jamous for a pulmonary consultation on the same day. AR 378–79. Thus, on February 11, 2011, Drown underwent a pulmonary consultation with Dr. Jamous for dyspnea on exertion, dysphonia,[14] diffuse pain, and fatigue with cough. AR 255–58. Dr. Jamous included in Drown's history that Drown lived in a house where she was exposed to pets and mold in her bathroom and that her weight had increased significantly in the past three years. AR 255–56. Drown stated that she was unable to go back to work because of pain. AR 255. Dr. Jamous ordered a CAT scan of Drown's chest via angiogram protocol, reviewed blood tests, and did a function test and echocardiogram. Drown's serology continued to be abnormal, but her lung function was within normal limits with a possible mid flow obstruction. AR 256–57. Dr. Jamous assessed Drown as having chronic fatigue secondary to a viral infection, underlying reactive airway disease post infectious in nature, abnormal serologic marker for possible rheumatoid disorder, chronic elevation of the IgM mycoplasma, and no pulmonary embolism. AR 257.

On March 2, 2011, Drown had a routine follow-up visit with Dr. Petersen. Dr. Petersen recounted the recent history of the evaluations of Drown as follows: "When seen here, she had a normal lung and joint exam. The rest of her exam was unremarkable." AR 361. Dr. Petersen noted that the serology continued to be unremarkable, except for a rheumatoid factor that was positive, a strongly positive cyclic citrullinated peptide (CCP)[15] antibody test, and a continued

---

[14]Dysphonia is "impairment of the voice manifested by hoarseness or other defects of phonation." Webster's Third New International Dictionary, supra note 10, at 712.

[15]A CCP antibody test is used to help diagnose rheumatoid arthritis. Cyclic Citrullinated Peptide Antibody,        Lab        Tests        Online        (April        9,        2012),

positive IgM mycoplasma with negative IgG[16] antibody.  AR 361.  Drown had undergone a six minute walk test which was reported as normal, but still complained of feeling short of breath even while at rest.  AR 361.  As is the case throughout Dr. Petersen's physical examinations, Drown appeared to be "in no apparent distress."  AR 360.  Dr. Petersen recommended initiation of Plaquenil[17] for the joint symptoms and fatigue, but was "hesitant to pursue any more aggressive immunosuppressive therapy without any objective findings of either musculoskeletal or lung inflammation or other findings of internal organ involvement."  AR 358–59.  Dr. Petersen referred Drown to an ear nose and throat (ENT) doctor for further evaluation of the dysphonia and decided to see her back within four to six weeks for reassessment.  AR 358. Drown felt herself unable to work with her breathlessness and joint symptoms, and Dr. Petersen gave Drown a note to excuse her work absence until seen in follow-up.  AR 358.

Drown also underwent a sleep diagnostic study in March of 2011.  AR 400–01.  The study was normal, and concluded:  "Fatigue and excessive daytime somnolence not readily explained by this good quality study with otherwise minimally reduced sleep efficiency and adequate time spent in REM."  AR 401.  In short, there were no significant findings in the sleep study.  AR 400–08.

On March 9, 2011, Drown saw Dr. Peter Kasznica, an ENT specialist, on a referral from Dr. Petersen for her breathlessness and hoarseness.  AR 316–19.  Drown underwent a flexible

---

http://labtestsonline.org/understanding/analytes/ccp/tab/test.  The presence of CCP antibodies makes a rheumatoid arthritis diagnosis more likely.  Id.

[16]The mycoplasma IgG antibody is the second antibody produced by one's body in response to a mycoplasma pneumoniae infection.  Mycoplasma, supra note 2.  A detectable amount of this antibody normally remains in a person's blood for the rest of his or her life following an mycoplasma pneumoniae infection.  Id.

[17]Plaquenil is the brand name for hydroxychloroquine, a medicine used to relieve inflammation, swelling, stiffness, and joint pain.  Drugs and Supplements: Hydroxychloroquine (Oral Route), Mayo Clinic (April 1, 2015), http://mayoclinic.org/drugs-supplements/hydroxychloroquine-oral-route/description/drg-20064216.

laryngoscopy,[18] which revealed a bulge on the right lateral pharynx and possible subglottic narrowing. AR 319. Dr. Kasznica prescribed omeprazole[19] to Drown for laryngopharyngeal reflux[20] issues. AR 319. Drown also had a mouth ulcer, apparently from poor-fitting dentures. AR 319. Drown underwent a CT scan of her neck as ordered by Dr. Kasznica on March 14, 2011, which was largely normal. AR 320–21. Drown had further visits to Dr. Kasznica on May 27, 2011, AR 322–25, and June 9, 2011, AR 326–29, and finally on September 15, 2011, AR 330–31, all for follow-up of the laryngopharyngeal reflux. By September of 2011, Drown's hoarseness had become much less severe, her response to the omeprazole had been excellent with her symptoms greatly improved, and her reflux was under control as long as she took the omeprazole. AR 330.

Drown's issues with joint pain did not similarly resolve. On April 7, 2011, Drown had a routine follow-up visit with Dr. Petersen. AR 353–57. Dr. Petersen recorded that she had spoken with Dr. Aris Assimacopoulos, an infectious disease physician then at Avera, about Drown's mycoplasma IgM having remained positive with a negative IgG. Dr. Assimacopoulos felt that it was likely a false positive mycoplasma titer, which confirmed Dr. Petersen's suspicion based on some other autoantibody production and immune stimulation. AR 354. In short, Drown has some auto-immune deficiency with susceptibility to pneumonia and joint pain, but the etiology of those problems appear to be somewhat mysterious. Dr. Petersen noted that

---

[18]Laryngoscopy is a procedure in which a doctor can visually examine a patient's vocal chords. Diseases and Conditions: Laryngitis, Mayo Clinic (April 21, 2015), http://www.mayoclinic.org/diseases-conditions/laryngitis/basics/tests-diagnosis/con-20021565.
[19]Omeprazole is a medication that decreases the amount of acid in the stomach. Drugs and Supplements: Omeprazole (Oral Route), Mayo Clinic (April 1, 2015), http://www.mayoclinic.org/drugs-supplements/omeprazole-oral-route/description/drg-20066836.
[20]Laryngopharyngeal reflux is the movement of stomach contents, including acids and enzymes, into the throat. Ramon A. Franco, Jr., MD, Laryngopharyngeal Reflux, UpToDate (Jan. 6, 2015), http://www.uptodate.com/contents/laryngopharyngeal-reflux.

Drown was tolerating Plaquenil well, continued her on Plaquenil, and had her continue the omeprazole as prescribed by the ENT doctor. AR 354.

Drown returned to Dr. Petersen on May 27, 2011. AR 349–52. Drown continued to complain of significant joint pain primarily in her hands, elbows, shoulders, hips, and knees. AR 351. Although Drown rated her pain as being nine on a ten-point scale, Drown's physical examination was normal, with Drown again being "in no apparent distress." AR 351. Drown was tender across her wrists, elbows, shoulders, knees, and ankles on examination, but had no obvious synovitis or swelling, no rheumatoid nodules,[21] and no deformities. AR 350. Dr. Petersen noted that Drown had no significant synovitis on exam to confirm rheumatoid arthritis, but her clinical presentation and multiple positive serologies were indicative of an underlying connective tissue disorder. AR 349. Dr. Petersen, based on the CCP antibodies and reported symptoms, opined that Drown likely had an "onset of clinical RA." AR 349. Dr. Petersen discussed alternatives with Drown for trying to get better relief from the joint pain, and ultimately chose to continue Plaquenil, and refill the Cataflam, tramadol, and omeprazole. AR 349.

Due to the prescribed Plaquenil and the possible side effects, Dr. Petersen had Drown see Dr. Ryan Ellwein for an eye examination, which took place on July 23, 2011, and resulted in multi-focal spectacles being prescribed. AR 314–15. The Plaquenil did not appear to be adversely affecting Drown's vision. AR 314–15.

---

[21]Rheumatoid nodules are "[f]irm bumps of tissue under the skin of [one's] arms." Diseases and Conditions:    Rheumatoid    Arthritis,    Mayo    Clinic    (Oct.    29,    2014), http://www.mayoclinic.org/diseases-conditions/rheumatoid-arthritis/basics/symptoms/con-20014868.

Drown returned for a routine follow-up with Dr. Petersen on September 14, 2011. AR 362–65. By this point, Drown had been on Enbrel[22] for approximately three months and reported that "maybe it was helping." AR 363. Drown advised that the pain medications seemed to be working longer and she was having some days where the pain was more tolerable. AR 363. Drown's main reports of pain were from her hips down, with diffuse pain throughout her legs. AR 363. Again, on physical examination, Dr. Petersen found Drown to be in no apparent distress. AR 363. Drown was tender across various joints, but still had no synovitis in any of her joints. AR 364. She was tender over the anserine bursa[23] areas and diffusely tender along the lower extremities, but had no deformities or loss of mobility. AR 364. Drown also had a "few scattered fibromyalgia[24] tender points but not enough for [formal] diagnostic criteria." AR 364. Dr. Petersen's plan at that point was to send Drown for physical therapy for possible bursitis[25] and to continue Drown on medications, with a follow-up assessment in four to five months. AR 365.

---

[22]Enbrel is the brand name of etanercept, a prescription drug used to reduce symptoms of arthritis "such as joint swelling, pain, tiredness, and duration of morning stiffness." Drugs and Supplements: Etanercept (Subcutaneous Route), Mayo Clinic (April 1, 2015), http://www.mayoclinic.org/drugs-supplements/etanercept-subcutaneous-route/description/drg-20066850.

[23]The anserine bursa is a sac-like structure that protects soft tissue in the area just below the knee, on the top of the tibia. Robert P. Sheon, M.D., Patient Information: Bursitis (Beyond the Basics), UpToDate (Nov. 7, 2012), http://www.uptodate.com/contents/bursitis-beyond-the-basics.

[24]"Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues. Researchers believe that fibromyalgia amplifies painful sensations by affecting the way your brain processes pain signals." Diseases and Conditions: Fibromyalgia, Mayo Clinic (Feb. 20, 2015), http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/con-20019243.

[25]Bursitis is caused by inflammation of the bursa, fluid filled sacs that cushion joints, tendons, and muscles near joints. Diseases and Conditions: Bursitis, Mayo Clinic (April 20, 2015), http://www.mayoclinic.org/diseases-conditions/bursitis/basics/definition/con-20015102.

Drown underwent physical therapy at Howard Physical Therapy from October 10, 2011, through December 1, 2011, for bilateral hip and leg pain with trochanteric[26] and anserine bursitis. AR 419–22. Drown told the physical therapist that she did not know how she was injured, but these symptoms had been "giving her trouble for the last couple of months and [have] gradually gotten worse." AR 419. Drown complained of a stabbing or shooting pain when walking and aching pain down her leg otherwise. AR 419. Drown's lower extremities had bilaterally comparable ranges of motion within functional limits, although limited in all directions. Drown had –4/5 strength[27] in all planes of her hip, knee, and lower extremities. AR 419. Drown had point tenderness, particularly over the greater trochanter bilaterally and down the path of the IT band. AR 419. She, however, did not have any significant swelling or warmth. AR 419. She appeared to have tightness in her hamstring musculature bilaterally and in her IT band, but all special tests for the lumbar spine, sacroiliac joint, hips, and knees were negative. AR 419. The records reflect that Drown underwent physical therapy at least on November 14, November 16, November 18, November 23, and December 1, 2011. AR 422. The progress therapy report concluded that Drown had hit a plateau with physical therapy on December 1, 2011, had not improved to the extent desired, and needed to look for another form of treatment as the therapy was giving her only temporary relief. AR 422.

---

[26]Trochanteric bursitis is inflammation of the trochanteric bursa, on the upper outer part of the thigh bone. Sheon, supra note 23.

[27]Medical providers commonly use Manual Muscle Testing (MMT) to assess strength. W.K. Durfee & P.A. Iaizzo, Rehabilitation and Muscle Testing, in 6 Encyclopedia of Medical Devices and Instruments 62, 63 (J.G. Webster ed, 2d ed. 2006) available at http://www.me.umn.edu/~wkdurfee/publications/wiley-chap-2006.pdf. The MMT uses a five point scale, with "+" and "–" modifiers. Id. A score of 0/5 indicates no muscle contraction, 5/5 indicates normal muscle contraction, and –4/5 indicates ability to contract a muscle against moderate resistance, over more than half of the full range of motion. Id. at 63–64 & tbl.1.

On December 29, 2011, Drown returned for a routine follow-up with Dr. Petersen. Drown told Dr. Petersen that the physical therapy sessions were helpful temporarily, but the pain returned and she still had diffuse and widespread joint pain, most symptomatic in her hips and knees. AR 431. Although Drown rated her pain at a ten, the physical examination revealed Drown to be "in no apparent distress." AR 431. Dr. Petersen observed that Drown had "some mild tenderness across various joints but certainly no findings of significant joint tenderness on exam." AR 432. Dr. Petersen recorded that there "[c]ertainly [were] no findings of any synovitis in the hands, wrists, elbows, shoulders, hips, knees, ankles, or MTPs"[28] and that Drown had "full range of motion at all joints." AR 432. However, Drown was more exquisitely tender over multiple fibromyalgia tender points and over the greater trochanteric and anserine bursas. AR 432. Dr. Petersen's impression was that fibromyalgia was the most likely explanation of Drown's progressive and diffuse widespread musculoskeletal pain, although Dr. Petersen also had the impression that Drown presumably had seropositive RA and bilateral trochanteric and anserine bursitis. AR 432. Dr. Petersen discussed at length the pathology and management of fibromyalgia with Drown and gave her information about daily aerobic exercise, as well as a prescription for amitriptyline[29] to help Drown sleep and mitigate fibromyalgia. AR 433. Dr. Petersen administered bilateral trochanteric injections in the clinic. AR 433. Despite Drown not having objective findings of active RA, Dr. Petersen chose to continue Drown on Enbrel and Plaquenil since she was tolerating those medications well. AR 433. Drown was to return to Dr.

---

[28]"MTPs" is an abbreviation for the metatarsophalangeal joints, the joints between the bones in the foot and the toes. Thomas Lathrop Stedman, Stedman's Medical Dictionary 463980 (27th ed. Aug. 2014 update).

[29]Amitriptyline is a tricyclic antidepressant that alters chemical levels in the brain. Drugs and Supplements:    Amitriptyline    (Oral    Route),    Mayo    Clinic    (April    1,    2015), http://www.mayoclinic.org/drugs-supplements/amitriptyline-oral-route/description/drg-20072061.

Petersen in three months for reassessment or sooner if symptoms worsened or new concerns arose. AR 434.

In the first three months of 2012, the only medical record on file is from Dr. Kasznica for a recheck of Drown's reflux. AR 480–83. Drown reported that she was doing well at the time and continued to take omeprazole, forty milligrams daily. AR 483. After a flexible laryngoscopy revealed just mild edema and overall improvement of the larynx, Dr. Kasznica decreased the omeprazole dosage from forty to twenty milligrams daily. AR 483.

On April 9, 2012, Drown had her routine follow-up visit with Dr. Petersen. AR 438–42. Drown reported pain through her shoulders and shooting down her right arm, with a sense that her right arm was not as strong as her left. Although she rated her pain at ten, the examination notes of Dr. Petersen again record Drown to be "in no apparent distress." AR 439. Drown did have multiple fibromyalgia tender points, but no swelling or synovitis in any joints anywhere and further full range of motion at all joints. AR 440. Dr. Petersen's impression remained the same as it had been in December of 2011. Dr. Petersen referred Drown for water aerobics/water therapy. AR 441. Drown at that point was off of her prescription pain medications, which Dr. Petersen thought to be a good plan. AR 441. Dr. Petersen chose to stop Enbrel to see what would happen with the joint symptoms, but to continue the Plaquenil. AR 441. Drown was to remain under the care of her primary care provider thereafter. AR 441.

There is no record of Drown obtaining any medical treatment between April 9 and September 11 of 2012, although she may have seen Dr. Petersen in June and undergone water therapy. See AR 569. On September 11, 2012, Drown went to Avera St. Joseph Clinic in Howard with a harsh cough and some postnasal drainage apparently from newly-contracted pneumonia. AR 458–59. Drown was hospitalized at Avera Queen of Peace in Mitchell for

pneumonia and anemia from September 12 until September 17, 2012. AR 444–55. On September 27, 2012, Drown saw Dr. Michael Krause, primarily due to anemia and menorrhagia. AR 470–77. By the time of her return visit on October 3, 2012, Drown was feeling better and voiced no complaints to the nurse. AR 533. However, at her follow-up visit on October 17, 2012, Drown still had a harsh cough. AR 540. At another follow-up visit on November 14, 2012, Drown continued to have a cough and to feel fatigued. AR 548–51.

Drown returned to Dr. Petersen on October 31, 2012. AR 569–74. Drown at that point was relying on pain medications and had diffuse widespread pain with multiple fibromyalgia tender points. AR 569. Dr. Petersen noted that Drown "was last seen in June, at which time she had no findings of active disease," and had been undergoing water therapy until it was interrupted by her hospitalization the previous month for pneumonia. AR 569. However, the Administrative Record lacks any such records. Drown's weight had increased notably. AR 569. The physical examination of Drown again was negative for synovitis or tenderness in small joints of her hands, wrists, elbows, knees, ankles, or MTPs. AR 570. Dr. Petersen continued Drown on Plaquenil and wanted to see her in four or five months or sooner if her conditions worsened. AR 571.

Drown likewise saw ENT Dr. Kasznica in October of 2012, for a recheck. AR 484–88. Drown stated that she was doing well, but had recently been hospitalized for pneumonia. AR 487. A flexible laryngoscopy revealed a severe erythema and moderate edema of the arytenoids,[30] the space between the arytenoids, and the area around the arytenoids. AR 487. Dr. Kasznica prescribed various medications. AR 487–88. When Drown next was seen by Dr.

---

[30]The arytenoids are two pieces of cartilage that connect the vocal chords to the larynx and many small muscles. The Larynx and Voice: Basic Anatomy and Physiology, InteliHealth, http://www.intelihealth.com/print-article/basic-anatomy-and-physiology (last visited April 27, 2015).

Kasznica on December 7, 2012, her main complaint was with a cough and oral lesions, and her edema had moderated. AR 492.

In November and December of 2012, Drown treated with Dr. Noel Tiangco at Avera Pulmonary and Sleep Medicine for a chronic cough that she had since the pneumonia onset in September of 2012. AR 502–18. Dr. Tiangco found her to be "not in any distress" on the physical examination, prescribed Tessalon Perles[31] to mitigate cough symptoms, and scheduled her for another appointment. AR 504. When Dr. Tiangco saw Drown back on December 7, 2012, Drown had a similar dry hacking cough. AR 517. Dr. Tiangco noted a positive IgG and IgM for pertussis,[32] refilled the Tessalon Perles and prescribed codeine[33] to help with her symptoms. AR 518. Dr. Tiangco evidently spoke with Drown on December 21, 2012, to advise that her CT scan had normal results and Drown responded that she was doing maybe a bit better. AR 518.

The most recent document in the Administrative Record from any medical provider is a form completed and signed by Dr. Petersen in January of 2013, regarding Drown receiving a handicapped parking permit. Dr. Petersen checked that Drown "[i]s severely limited in ability to walk due to arthritis, neurologic, or orthopedic conditions." AR 574. However, Dr. Petersen did not check the spot for "physical disability is permanent," and instead checked that "Applicant's

---

[31]Tessalon Perles is a brand name for Benzonatate, a prescription medication that relieves coughs by "acting directly on the lungs and the breathing passages." Drugs and Supplements: Benzonatate (Oral Route), Mayo Clinic (April 1, 2015), http://www.mayoclinic.org/drugs-supplements/benzonatate-oral-route/description/drg-20062223.

[32]Pertussis, also known as Whooping Cough, is a contagious respiratory tract infection, often causing a severe cough followed by a "high-pitched intake of breath that sounds like 'whoop.'" Diseases and Conditions: Whooping Cough, Mayo Clinic (Jan. 15, 2015), http://www.mayoclinic.org/diseases-conditions/whooping-cough/basics/definition/con-20023295.

[33]Codeine is a narcotic pain medication used to relieve mild to moderately severe pain. Drugs and Supplements: Codeine (Oral Route), Mayo Clinic (April 1, 2015), http://www.mayoclinic.org/drugs-supplements/codeine-oral-route/description/drg-20074022.

physical disability is temporary" with an onset of January 10, 2013, and an expected recovery of January 10, 2014. AR 574.

During the pendency of Drown's claim for benefits, two state examining physicians reviewed what medical records of Drown were available to them. The first such review, conducted by Dr. Frederick Entwistle, whose report is dated May 10, 2011, concluded that Drown's reports of extreme limitations in her activities of daily living were not consistent with the medical findings. AR 63. Dr. Entwistle considered Drown's residual functional capacity (RFC) as allowing her to occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand and walk with normal breaks six hours in an eight-hour day, and sit with normal breaks six hours in an eight-hour day. AR 64. Dr. Entwistle believed Drown to have no limits on pushing and pulling, and believed her able to frequently climb ramps or stairs. AR 64. Dr. Entwistle believed her capable of performing past relevant work and opined that she was not disabled. AR 66–67.

The second state doctor to do a records review was Dr. Kevin Whittle, whose report is dated September 29, 2011. AR 77–96. Dr. Whittle noted that Drown was claiming to have worsened physically since Dr. Entwistle's report, including experiencing greater limits on her activities of daily living. AR 79. Dr. Whittle reviewed additional records not available to Dr. Entwistle, including treatment records through September of 2011. AR 80–81. However, Dr. Whittle reached the same conclusion as Dr. Entwistle, in finding Drown's reported limitations on activities of daily living not to be consistent with her medical conditions. AR 82. Dr. Whittle's residual functional capacity assessment for Drown paralleled that of Dr. Entwistle, but deemed Drown able to climb ramps and stairs occasionally and to stoop occasionally, thus having slightly more limitations than what Dr. Entwistle believed. AR 83–84. Dr. Whittle likewise

concluded that Drown was able to perform past relevant work and determined her not to be disabled. AR 86.

ALJ Busick held Drown's evidentiary hearing on October 4, 2012. Drown, represented by counsel at the time, called only herself as a witness. Drown testified that she weighed 150 pounds at the time she got sick, and had gained a considerable amount of weight in the few years that she had been sick. AR 34–35. Drown's medical records, however, reveal that at the time she was initially seen for pneumonia in November of 2010, her weight was 174. AR 281. Drown testified to her past employment history accurately, including describing her full-time work for the Howard School District which she held until November of 2010. AR 35–41. Drown testified that she had not worked anywhere since because of her ongoing and constant pain, including focusing part of her testimony on back pain, which was not the subject of any of her medical records. AR 41–43. Drown testified that her average pain was 8.5 to 9 on a 10-point scale, even with medication. AR 44. Drown testified that treatment, such as the injections that Dr. Petersen administered, only provided her temporarily relief. AR 45. Drown testified that she could comfortably sit for only fifteen minutes at a time and could stand at most for fifteen minutes of time, with the ability to walk only about half a block. AR 46. According to Drown, she cannot navigate stairs and becomes sleepy during the day due to her medications. AR 47–48. Drown described very limited household activities. AR 50–51. Drown had filed during the pendency of her claim written statements describing herself as having extremely limited functioning and activities. AR 208–15, 218–24, 227–33. No one from Drown's family or community testified or had filed any statement regarding Drown's physical abilities.

The only other witness at Drown's hearing was vocational expert Thomas Audet, who was called by the ALJ. AR 54–56. Audet had never met Drown, but had reviewed the file and

listened to Drown's testimony. The ALJ asked Audet a hypothetical that assumed the RFC of Dr. Whittle to be accurate, and Audet's testimony was in essence that Drown could do sedentary work, such as that of a secretary. AR 55–56. The ALJ then revised the hypothetical to a scenario where Drown could pick up ten pounds or less occasionally, and Audet confirmed that the same sort of position would be available to Drown. AR 56. The ALJ then further revised the hypothetical to describe a person who would have a combination of impairments that would cause diminishment in the ability to maintain persistence and pace and whose stamina would be reduced, prompting a response from Audet that such a person probably could not maintain secretarial work. AR 56–57.

After the hearing, Audet completed a "vocational interrogatory" apparently crafted by the ALJ. AR 240–46. Part of that interrogatory and answer was the following:

> 7.     Assume a hypothetical individual who was born [in October of] 1964, has at least a high school education and is able to communicate in English as defined in 20 C.F.R. 404.1564 and 416.964, and has work experience as described in [Drown's work history summary]. Assume further that this individual has the residual functional capacity (RFC) to perform less than the full range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except: the person is limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently. The person is limited to sitting (with normal breaks) for about 6 hours out of an 8-hour workday. The person is limited to standing or walking (with normal breaks) for about 6 hours out of an 8-hour workday. Pushing and pulling is unlimited at the light resistance level. The person is not qualified to climb ladders, scaffold or ropes. The person is limited to occasionally balancing, stooping, kneeling, crouching, crawling and climbing stairs or ramps. The person has no manipulative, visual or communicative limitations. Environmentally, the person should avoid concentrated exposure to heat and humidity and even moderate exposure to fumes, odors, dust, gases and poor ventilation.
>
> 8.     Could the individual described in Item #7 perform any of the claimant's past jobs as actually performed by the claimant or as normally performed in the national economy?

AR 241.  In response to that question, Audet marked the box "yes" and explained:

> [H]ypothetical individual could perform work as a teacher['']s aide
> as it is described in the DOT.  But not as claimant performed it
> because she had to lift at medium levels.  As per the DOT Teacher
> Aide is considered light work and there are no environmental
> factors indicated except for moderate noise levels.

AR 241.  Later in the vocational interrogatory, the ALJ queries:

> 10.    Could the individual described in Item #7 perform any
> unskilled occupations with jobs that exist in the national economy?

AR 242.  To this inquiry, Audet marked the box "yes," indicating that such a person could be a

cashier II, light, SVP 2, 211.462-010, for which there are 450,000 jobs in the national economy,

or a stock checker 299.667-014, light, SVP 2, for which there are 30,000 jobs in the national

economy, or a mail clerk 209.687-022, light, SVP 2, for which there are 50,000 jobs in the

national economy.  AR 242.

The vocational interrogatory then changed the hypothetical somewhat:

> 12.    Assume a hypothetical individual who was born [in
> October of] 1964, has at least a high school education and is able
> to communicate in English as defined in 20 C.F.R. 404.1564 and
> 416.964, and has work experience as described in [Drown's work
> history summary].  Assume further that this individual has the
> residual functional capacity (RFC) to perform sedentary work as
> defined in 20 C.F.R. 404.1567(b) and 416.967(b) except:  the
> person was limited to lifting and carrying 10 pounds occasionally
> and less weight frequently.  The person is limited to sitting (with
> normal breaks) for about 6 hours out of an 8-hour workday.  The
> person is limited to standing or walking (with normal breaks) for a
> combined total of about 3 hours out of an 8-hour workday.

AR 243.  To this question, Audet responded that such a person could not engage in the previous

work that Drown had done.  AR 243.  The vocational interrogatory then asked:

> Could the individual described in item #12 perform any unskilled
> occupations with jobs that exist in the national economy?

21

AR 244. Audet replied that such a person could work as a final assembler, 713.687-018, SVP 2, sedentary, where 9,000 jobs exist in the national economy, or as a preparer, 700.687-062, SVP 2, sedentary, where 10,000 jobs in the national economy, or as a lens inserter, 713.687-026, SVP 2, sedentary, where 8,000 to 9,000 jobs exist in the national economy. AR 244. However, Audet then noted that a drop-off in productivity of twenty-five percent during the workday would likely result in such a person not being able to maintain such work. AR 245.

On December 7, 2013, the ALJ issued a written decision denying Drown's application for benefits. AR 12–20. In so doing, the ALJ used the sequential five-step evaluation process in 20 C.F.R. §§ 404.1520(a) and 416.920(a). Under "the familiar five-step process" to determine whether an individual is disabled, Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010), "[t]he ALJ 'consider[s] whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work." Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (second alteration in original) (quoting Halverson, 600 F.3d at 929); see also 20 C.F.R. § 416.920 (detailing the five-step process used in evaluating claims).

At the first step, the ALJ determined that Drown had not engaged in substantial gainful activity since the alleged disability date. AR 14. At step two, the ALJ found that Drown suffered from severe impairments of rheumatoid arthritis, bilateral trochanteric and anserine bursitis with fibromyalgia. AR 14–15. At step three, the ALJ determined that Drown did not have an impairment or a combination of impairments that met or medically equaled a listed impairment. AR 15–16. The ALJ determined that Drown's RFC was consistent with performing sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), in that she was limited to lifting and carrying ten pounds occasionally and less than that frequently, and with normal work

22

breaks could sit six hours out of an eight-hour workday, but could stand and walk combined only three hours of an eight-hour workday. AR 16. Based on this RFC determination, the ALJ at step four concluded that Drown could not perform any past relevant work. AR 18–19. However, the ALJ discounted Drown's credibility concluding that she exaggerated her limitations and reported pain. AR 18. In the fifth and final step, the ALJ considered Drown's age, education, work experience, and RFC, as well as testimony from Audet and concluded that there are "jobs existing in significant numbers in the national economy that [Drown] can perform." AR 19–20. Accordingly, the ALJ found that Drown was not disabled and thus not entitled to the requested benefits. AR 20.

### III.    Standard of Review

"When considering whether the ALJ properly denied social security benefits, we determine whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law," id. (internal citations omitted), and such errors are reviewed de novo, id. (quoting Juszczyk v. Astrue, 542 F.3d 626, 633 (8th Cir. 2008)).

The Commissioner's decision must be supported by substantial evidence in the record as a whole. Evans v. Shalala, 21 F.3d 832, 833 (8th Cir. 1994). "Substantial evidence is more than a mere scintilla," Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938), but "less than a preponderance," Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2008)). It is that which a "reasonable mind would find adequate to support the Commissioner's conclusion." Miller v. Colvin, ___ F.3d ___, ___, No.

14-1639, slip op. at 6 (8th Cir. April 27, 2015), available at http://www.ca8.uscourts.gov/all-opinions; accord Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998); Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996). "[T]he 'substantial evidence in the record as a whole' standard is not synonymous with the less rigorous 'substantial evidence' standard." Burress, 141 F.3d at 878. "'Substantial evidence on the record as a whole' . . . requires a more scrutinizing analysis." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (internal citation omitted).

A reviewing court therefore must "consider evidence that supports the [Commissioner's] decision along with evidence that detracts from it." Siemers v. Shalala, 47 F.3d 299, 301 (8th Cir. 1995). In doing so, the court may not make its own findings of fact, but must treat the Commissioner's findings that are supported by substantial evidence as conclusive. 42 U.S.C. § 405(g); see also Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987) (noting that reviewing courts are "governed by the general principle that questions of fact, including the credibility of a claimant's subjective testimony, are primarily for the [Commissioner] to decide, not the courts"). "If, after undertaking this review, [the court] determine[s] that 'it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings, [the court] must affirm the decision' of the [Commissioner]." Siemers, 47 F.3d at 301 (quoting Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). The court "may not reverse simply because [it] would have reached a different conclusion than the ALJ or because substantial evidence supports a contrary conclusion." Miller, ___ F.3d at ___, slip op. at 6.

## IV.   Discussion

Drown raises three issues with the ALJ's determination: (1) whether the ALJ correctly determined that Drown's combined impairments did not equal a listing-level impairment; (2)

whether the ALJ properly assessed Drown's credibility; (3) whether the ALJ properly determined Drown's RFC.  Doc. 17 at 33.  These issues will be addressed in turn.

### A. Step Three Issue—Equivalence to Listing-Level Impairment

Drown argues that the ALJ erred at step three by failing to consider whether her combined conditions of rheumatoid arthritis, fibromyalgia, and bilateral bursitis were medically equivalent to listing 14.09D, the listing for inflammatory arthritis.  The Commissioner disagrees, contending that the evidence did not warrant a determination of equivalency to listing 14.09D and noting that the ALJ not only considered and rejected that Drown's rheumatoid arthritis was closely analogous to that listing, but also stated that he "considered the claimant's impairments both singly and in combination" at step three.  AR 16.

The listing of impairments describes impairments for each of the major body systems that the Commissioner considers "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 404.1525(a).  At step three, the ALJ must determine whether a claimant's impairments, when taken individually and in combination, meet or are medically equal to a listed impairment. Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003).  When a claimant has "a combination of impairments, no one of which meets a listing . . . , [the ALJ] will compare [the claimant's] findings with those for closely analogous listed impairments."  20 C.F.R. § 404.1526(b)(3).  To be medically equivalent, the combination of impairments must be "at least equal in severity and duration to the criteria in any listed impairment."  20 C.F.R. § 404.1526(a).  "Medical equivalence must be supported by medical findings; symptoms alone are insufficient."  Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008).  The claimant bears the burden of establishing that her impairments equal a listing.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).

25

ALJ Busick expressly considered listing 14.09D by stating:

> The undersigned considers listing 14.09 in evaluating the claimant's rheumatoid arthritis. The condition does not meet the listing because it has not resulted in an inability to ambulate effectively. There is no evidence the arthritis significantly impedes the functioning of at least two of her organs. Nor is there evidence that it has caused ankylosing spondylitis, or marked limits in activities of daily living, social functioning, or concentration, persistence, or pace.

AR 15. The ALJ then considered Drown's bilateral bursitis and her fibromyalgia in considering listings 1.02, 1.00, and 11.00. AR 15–16. At the conclusion of that analysis, the ALJ stated that he had considered Drown's "impairments both singly and in combination and [found] they do not meet or equal the criteria established for any of the listed impairments." AR 16. Drown's argument here is that, in combination, Drown's impairment equaled the listing in 14.09D.

Listing 14.09D requires:

> Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
> 1. Limitation of activities of daily living;
> 2. Limitation in maintaining social functioning;
> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. pt. 404, subpt. P, app. 1, § 14.09D. The medical records, bolstered by Drown's own testimony, establish that she has experienced limitations of activities of daily living. However, Drown's medical records and testimony fail to establish that she has experienced "at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)." Id. The records establish that Drown has gained—and not involuntarily lost—weight since the alleged onset date of disability. There is nothing in the records or testimony about Drown experiencing fever. Drown certainly suffered from malaise during the two periods of time when

26

she had pneumonia, but otherwise is described in the medical records as "alert, oriented, and in no apparent distress" repeatedly. There is information that Drown during times had severe fatigue, but this is only one of the constitutional symptoms set forth in the regulation and Drown is required to have "at least two" of these symptoms to meet or be equivalent to Listing 14.09D. Id.

It is disconcerting that the ALJ did not explicitly discuss the criteria of 14.09D or expressly consider Drown's medical conditions in combination in the paragraph addressing listing 14.09. However, the United States Circuit Court of Appeals for the Eighth Circuit repeatedly has held that an ALJ satisfies the duty to consider impairments in combination when the ALJ lists each impairment and then states that he has considered them in combination, as ALJ Busick did here. See, e.g., Raney v. Barnhart, 396 F.3d 1007, 1011 (8th Cir. 2005); Brower v. Barnhart, 91 F. App'x 518, 519 (8th Cir. 2004); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992).

The ALJ's analysis appeared to focus more on § 14.00D6, which requires for inflammatory arthritis the involvement of "one or more major peripheral joints or other joints, such as inflammatory or deformatory, extra-articular features, repeated manifestations, and constitutional symptoms or signs." 20 C.F.R. pt. 404, subpt. P, app. 1 § 14.00D6e(ii). Drown's rheumatologist in her repeated examinations of Drown found a lack of joint inflammation or synovitis, AR 355, 358–59, 375, 383–84, 571; no musculoskeletal deformity, AR 274, 350, 364, 379, 384, 432, 440, 450, 464, 570; and commonly full range of motion of all joints, AR 355, 359, 379, 384, 440. Thus, Drown's objective symptoms lacked the required involvement of major joints or other joints for inflammatory arthritis. Accordingly, there is substantial evidence in the

record supporting the ALJ's overall conclusion that Drown's impairments did not meet or medically equal a listed impairment.

### B. Credibility Finding

Drown argues that the ALJ erred by improperly discounting statements Drown made concerning her pain and limitations. The Commissioner argues that the ALJ had good reason to find Drown to have exaggerated her limitations.

When analyzing a claimant's subjective complaints of pain and limitation, an ALJ under Eighth Circuit precedent must consider the objective medical evidence, the claimant's work history, and the "Polaski factors," which include "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medications; and (5) functional restrictions." Perkins v. Astrue, 648 F.3d 892, 900 (8th Cir. 2011) (internal quotation marks omitted) (listing factors articulated in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). An ALJ need not explicitly discuss each Polaski factor, but an ALJ who rejects subjective complaints "must make an express credibility determination explaining the reasons for discrediting the complaints." Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000)).

Although an ALJ may not discount a claimant's subjective complaints solely because they are not fully supported by objective medical evidence, a claimant's complaint "may be discounted based on inconsistencies in the record as a whole." Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005). A district court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." Perks v. Astrue, 687 F.3d 1086, 1091 (8th Cir. 2012) (quoting Pelkey v. Barnhart, 432 F.3d 575,

578 (8th Cir. 2006)).  The Eighth Circuit has cautioned judges against substituting their opinions

for opinions of ALJs, who are "in a better position to assess credibility."  Eichelberger v.

Barnhart, 390 F.3d 584, 590 (8th Cir. 2004).  Drown's case appears to be a common one where

"there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain

is."  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (quoting Woolf v. Shalala, 3 F.3d 1210,

1213 (8th Cir. 1993)).

ALJ Busick in evaluating Drown's credibility found:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above RFC assessment.
>
> While the undersigned appreciates the claimant's continued issues with RA, fibromyalgia, and bursitis, her statements and testimony regarding severity of symptoms is not fully credible.  The claimant testified, with medication, her pain level was consistently around an 8.5-9 (in a scale of 1-10); despite this very high level of alleged pain, the claimant was able to coherently testify and sit through her 40-minute hearing.  At her December, 2011 rheumatologist appointment she reported her pain was a "10", despite Dr. Peterson [sic] noting she was "alert, oriented, and in no apparent distress" and "she has some mild tenderness across various joints but certainly no findings of significant joint tenderness on exam.  Certainly no findings of [any] synovitis in the hands, wrists, elbows, shoulder, hips, knees, ankles, or MTPs (Ex. 10F/8)".  The claimant's assertion she was experiencing a pain level of "10" is not credible given the lack of objective medical findings and the fact that 10 out of 10 on the pain scale means 10 is experiencing the worst pain of their life.  In April of 2012, she again rated her pain at "10", and Dr. Peterson [sic] again noted she was in no apparent distress and she did not have any swelling or synovitis upon examination (Ex. 10F/17).  The claimant's apparent exaggeration of her pain levels diminishes her credibility.

> Considering the claimant's activities of daily living and previous work activity, treatment records, DDE assessments . . . , and the subjective complaints and hearing testimony, the undersigned finds that claimant's limitations are not fully disabling, and the claimant retains the capacity to perform work activities with the limitations set forth above.

AR 18.

Drown's approach in criticizing the ALJ's decision is to point to portions of the medical record supporting that Drown had limitations, to rely on Drown's testimony, to cite to the plethora of medications prescribed to Drown, and to argue about what the ALJ did not write or find. Doc. 17 at 40–45.

Drown's claim pivots on her credibility. If Drown's written statements and testimony concerning her extremely limited activities of daily living are credited in full, then she is disabled. See AR 40–51, 208–15, 218–24, 227–33. Drown's medical records present a very mixed picture by recording her subjective complaints and frequent statements of having pain at or near nine on a ten-point scale, yet light on objective findings and repeatedly indicating that she had full range of motion of all joints, no inflammation or synovitis, and was in no apparent distress. There is sparse information in the medical record about the extent of her physical abilities or limitations. The Eighth Circuit previously in Young v. Apfel, 221 F.3d 1065 (8th Cir. 2000) stated: "We find it significant that no physician who examined [the claimant] submitted a medical conclusion that she is disabled and unable to perform any type of work." Id. at 1069. Similarly, the Eighth Circuit has concluded that the absence of any significant restrictions on a claimant's activities by her doctors can undermine subjective complaints of pain. Melton v. Apfel, 181 F.3d 939, 941 (8th Cir. 1999); see also Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003) ("[N]o functional restrictions were placed on [the claimant's] activities, a fact that we

have previously noted is inconsistent with a claim of disability."). Drown's medical records are largely devoid of any medically imposed restriction, and while the medical records document instances where Drown reports she is unable to work, no physician deemed Drown to be disabled, at least until Dr. Petersen completed the form about Drown's temporary physical disability in January of 2013. AR 514. Indeed, the only testimony about Drown's limited abilities came from Drown herself, without any corroborating written submissions or testimony of any person who observed Drown in her ordinary life.

Ultimately, this Court must determine whether the ALJ's credibility decision is supported by substantial evidence in the record. While Drown can point to countervailing evidence, the ALJ's credibility analysis quoted above is based on evidence of record. Although the ALJ did not directly follow the Polaski factors, the ALJ did make an express credibility determination with an explanation for discounting the extent of physical limitations asserted by Drown. See Wagner v. Astrue, 499 F.3d at 851; Singh, 222 F.3d at 452. As the Eighth Circuit has cautioned, the ALJ is in a better position to assess Drown's credibility, having observed her during the hearing and in giving testimony. See Eichelberger, 390 F.3d at 590. This Court cannot on this mixed record determine that the ALJ erred in discounting in part Drown's testimony concerning her limitations, to the extent that they were inconsistent with the RFC determined by the ALJ.

### C. Residual Functional Capacity Determination

The claimant's "RFC is defined as the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (quoting Leckenby v. Astrue, 487 F.3d 626, 631 n.5 (8th Cir. 2007)). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the work place." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir.

2007). "The ALJ determines the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." Eichelberger, 390 F.3d at 591.

The ALJ assessed Drown's RFC as limited to sedentary work—lifting and carrying ten pounds occasionally and less than that frequently, and with the ability to sit for six hours out of an eight-hour work day with normal breaks, and with the ability to stand and walk, combined, only three hours out of an eight-hour work day. AR 16. The ALJ wrote that "[i]n making this finding, the undersigned has considered all symptoms and the extent to which they are consistent with objective medical evidence and other evidence." AR 16. Drown contends that the ALJ erroneously discounted Drown's reported symptomology and that the ALJ was unqualified to render a medical opinion. Doc. 17 at 46. Drown's first argument fails because an ALJ need not include subjective limitations reported by the claimant in an RFC when, as here, the ALJ has found those not to be credible. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005) ("Tellez fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were 'less than fully credible,' and we give the ALJ the deference in that determination.").

Drown's remaining argument about the ALJ's RFC determination deserves greater attention, however. Drown did not undergo a functional capacity assessment. None of Drown's medical providers directly assessed Drown's functional capacities. The two state agency doctors—Dr. Frederick Entwistle and Dr. Kevin Whittle—conducted records reviews and expressed opinions concerning Drown's RFC based thereon. AR 59–67, 77–96. Dr. Entwistle and Dr. Whittle had similar assessments for RFC, believing Drown able to occasionally lift and carry twenty pounds, and frequently being able to lift and carry ten pounds, with Drown being

able to stand and walk six hours in an eight-hour day and to sit with normal breaks six hours in an eight-hour day. AR 64, 83–84. Dr. Whittle believed Drown to be more limited in his RFC assessment, deeming Drown more limited in climbing ramps and stairs, for instance, than did Dr. Entwistle.   AR 64–65, 83–84.   However, both Dr. Entwistle and Dr. Whittle ultimately determined that Drown had the ability to perform past relevant work. AR 66, 86. ALJ Busick determined Drown not to be able to perform past relevant work and assessed an RFC with greater limitations than that proffered by Dr. Entwistle and Dr. Whittle. AR 16, 18–19.

To argue for reversal, Drown invokes Nevland v. Apfel, 204 F.3d 853 (8th Cir. 2000). In Nevland, the Eighth Circuit reversed and remanded the ALJ's decision because there was "no *medical* evidence about how [the claimant's] impairments affect his ability to function now." Id. at 858. Rather than seeking an opinion on the claimant's RFC from a treating or examining physician, in Nevland, the "ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of [the claimant's] RFC." Id. "The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole," according to the Nevland decision. Id.

Unlike in Nevland, however, ALJ Busick did not base Drown's RFC solely on the reports of non-treating, non-examining physicians. Indeed ALJ Busick departed from the opinions of Dr. Entwistle and Dr. Whittle, engaged in an extensive review of the medical evidence, and ultimately determined Drown's RFC to be more limited than what either Dr. Entwistle or Dr. Whittle had opined. See Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (affirming ALJ decision that claimant had RFC to perform substantial gainful activity in the national economy where, in addition to considering consulting physician's opinion, the ALJ considered

the medical evidence, statements of the claimant's treating physician, the claimant's description of his daily activities, and the claimant's lack of motivation to return to work). The Eighth Circuit does not require the ALJ to link each component of an RFC to a specific medical opinion. See Martise, 641 F.3d at 927; see also Miller, ___ F.3d at ___, slip op. at 10 ("[T]he ALJ bears 'the primary responsibility for assessing a claimant's [RFC] based on *all* relevant evidence." (emphasis added) (quoting Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010))); Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 362 (3rd Cir. 2011) (reversing district court and affirming ALJ decision because ALJ could properly make an RFC determination without an outside medical experts review; Robinson v. Astrue, 365 F. App'x 993, 999 (11th Cir. 2010) (per curiam) (recognizing that the ALJ has province and discretion to determine RFC and claimant's ability to work). In an ideal case, Drown would have gone through a formal functional capacity assessment, and more information should have come from her treating physicians about what functional limitation she in fact has. However, no authority within the Eighth Circuit exists for this Court to reverse because the record is less than ideal or because the ALJ chose not to have the record further supplemented. Drown and her counsel did not come forward with information from her treating providers about her functional limitations. The ALJ was left to draw the RFC from medical records, opinions of the non-treating doctors, materials of record, and his observation of Drown and regard for her credibility. Here, it appears that "the ALJ properly limited his RFC determination to only the impairments and limitations he found to be credible based on his evaluation of the entire record." See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003). Accordingly, the ALJ's evaluation of Drown's RFC is supported by substantial evidence in the record, including, but not limited to, the fact that the two state examining

physicians found Drown to have an RFC of a greater capacity than what the ALJ ultimately assigned.

## V.   Conclusion

Drown has some significant auto-immune deficiency issues.   Whether she is disabled hinges on the extent to which she is credible in describing her limitations and on her RFC.   On those key determinations, this Court cannot supplant the ALJ's determinations because substantial evidence on the record as a whole exists to support what the ALJ decided.   Therefore, for the reasons explained above, it is hereby

ORDERED that the Commissioner's decision is affirmed.

DATED this 8th day of May, 2015.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE